**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff,* | **CRIMINAL NO. 17-160 (DRD)** |
| v. | |
| **WALDEMAR MARTINEZ-ORTIZ,** | |
| *Defendant.* | |

**OPINION & ORDER**

Waldemar Martinez-Ortiz (hereinafter, the "Defendant") is charged with three (3) carjacking offenses. Namely, the carjacking of a 2009 Toyota Yaris vehicle, bearing Puerto Rico plate HLK-625, Vehicle Identification Number (hereinafter, "VIN") JTDKT903895262931 by force, violence, and intimidation resulting in serious bodily injury, that is: sexual assault, from the person or presence of two female adult victims (hereinafter, "Count One"); the carjacking of a grey 2013 Hyundai Tucson vehicle, bearing Puerto Rico license plate number IFF-658, VIN number KM8JU3AC4DU739028, by force, violence and intimidation, from the person or presence of a female adult victim (hereinafter, "Count Two"); and the carjacking of a 2010, white, Nissan Versa vehicle, bearing Puerto Rico plate HSF-938, VIN number 3N1CC1APXAL359269 by force, violence, and intimidation resulting in serious bodily injury, that is: sexual assault, from the person or presence of two female adult victims (hereinafter, "Count Three"). *See* 18 U.S.C. §§ 2119(1) and (2); *see also Superseding Indictment*, Docket No. 23.

Defendant moves to suppress statements which he made to Puerto Rico Police Department (hereinafter, "PRPD") officers and prosecutors of the Puerto Rico Department of

Justice (hereinafter, "state prosecutors") on February 7 and 8, 2017. *See* Docket No. 49 at 1-2. The Defendant was injured in the head with a crowbar in the late hours of February 6 or early hours of February 7, 2017, before his arrest. Accordingly, "because of 'the beating, medication, and stress caused by the events of the early morning' any such statements which law enforcement obtained from Defendant during the rest of the day on February 7, 2017 must be suppressed because those statements 'were not provided voluntarily or knowingly.' Docket No. 84 at 2. The Government filed a response in opposition. *See* Docket No. 58. Thereafter, Honorable Magistrate Judge Marcos E. López held evidentiary hearings on April 27 and 28. 2022 in which testimony and oral arguments from both parties were heard and documentary evidence submitted into the record for the Court's review and consideration. *See* Docket Nos. 76-79.

The Hon. Marcos E. López issued an exceptional report and recommendation to deny said motion. Id. Defendant, after apparently losing faith in his arguments, declined to file an objection to the Magistrate's report and recommendation. For the reasons set forth below, the Court hereby **ADOPTS** the Magistrate's report and recommendation and **DENIES** Defendant's motion to suppress.

## I.    REFERRALS TO MAGISTRATE JUDGES

The Court may refer dispositive motions to a United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  *See* Local Rule 159; *Matthews v. Weber*, 423 U.S. 261 (1976).  Any party may contest the Magistrate Judge's report and recommendation by filing its objections.  Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1).  "A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  "A

judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.*

"Absent objection, . . . [a] district court ha[s] a right to assume that [the affected party] agree[s] to the magistrate's recommendation." *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir. 1985), *cert denied*, 474 U.S. 1021 (1985). Additionally, "failure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objections are precluded upon appeal." *Davet v. Maccarone*, 973 F.2d 22, 30-31 (1st Cir. 1992); *see Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994) (holding that objections are required when challenging findings actually set out in a magistrate's recommendation, as well as the magistrate's failure to make additional findings); *see also Lewry v. Town of Standish*, 984 F.2d 25, 27 (1st Cir. 1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); *Borden v. Sec. of H.H.S.*, 836 F.2d 4, 6 (1st Cir. 1987) (holding that appellant was entitled to a de novo review, "however he was not entitled to a de novo review of an argument never raised").

In order to accept unopposed portions of the Magistrate Judge's report and recommendation, the Court need only satisfy itself that there is no "plain error" on the face of the record. *See Douglass v. United Servs. Auto, Ass'n*, 79 F.3d 1415, 1419 (5th Cir. 1996) (en banc) (extending the deferential "plain error" standard of review to the legal conclusions of a magistrate judge that were not objected to); *see also Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. 1982) (en banc) (appeal from district court's acceptance of a magistrate judge's findings that were not objected to was reviewed for "plain error"); *see also Nogueras-Cartagena v. United States*, 172 F.Supp. 2d 296, 305 (D.P.R. 2001) (finding that the "Court reviews [unopposed]

Magistrate's Report and Recommendation to ascertain whether or not the Magistrate's recommendation was clearly erroneous") (adopting the Advisory Committee note regarding Fed. R. Civ. P. 72(b)); *see also Garcia v. I.N.S.*, 733 F.Supp. 1554, 1555 (M.D.Pa. 1990) (finding that "when no objections are filed, the district court need only review the record for plain error").

## II.   NO PLAIN ERROR

"[W]here, as here, a [Magistrate] has produced a first-rate work product, a reviewing tribunal should hesitate to wax longiloquence simply to hear its own words resonate." *In re San Juan Dupont Plaza Hotel Fire Litig.*, 989 F. 2d 36, 38 (1st Cir. 1993).  Therefore, the Magistrate's analysis is enclosed below[1]:

## II. FINDINGS OF FACT

### A. Defendant's Attempted Robbery on February 6-7, 2017 & The Resulting Beating

Late on the night February 6, 2017 or the very early morning of February 7, 2017, Defendant was driving down a street in Bayamón, Puerto Rico when he spotted a "girl" talking to a "young man" in front of a house. Hearing, Apr. 27, at 9:33 AM. Defendant parked his vehicle two streets away and returned by foot to the house where he had seen the two people conversing, carrying with him a fake pistol. As he came closer to the house Defendant saw a third person talking on a cell phone 10 to 15 feet further away. Defendant nevertheless addressed the couple and announced that this was a "hold up." Hearing, Apr. 27, at 9:33 AM. Upon declaring the robbery he moved the couple inside the house where he grabbed the girl and threw her onto the ground and told the young man to sit down on the furniture. Defendant asked the couple if they had money and took a twenty-dollar bill from the young man's wallet before heading toward the door. As he was leaving, the third person who Defendant had seen on the street approached him and began asking Defendant what he was doing there. The third person began to argue and physically struggle with Defendant, and the third person at some point identified himself as the girl's brother. When the girl's brother grabbed Defendant's pistol, he perceived that it was fake. The brother then declared that the pistol was fake and the young man sitting on the couch rose and helped the brother in his fight to subdue Defendant. The altercation moved to the road when a fourth person arrived at the scene with a crowbar and

---

[1] The Court notes that all of the subsequent footnotes stem from the report and recommendation.

began using it to beat Defendant's legs. The girl's brother then took the crowbar away from the fourth person and used it to strike Defendant on the head. Defendant tried to protect his head with his hands and then verbally surrendered to his intended victims, saying "Enough." Hearing, Apr. 27 at 9:37 AM. The intended victims took away Defendant's fake pistol and called the police. At that time, Defendant tried to walk away and escape from the scene, but his intended victims caught him and hit Defendant again with the crowbar, subduing him.

### B. Defendant at the Hospital

When the police arrived, they placed Defendant under arrest and transported him in an ambulance to the Doctors' Center Hospital. After Defendant was taken to the hospital, police called Defendant's consensual partner, Ms. Zorilit López Báez ("Ms. López"), informed her that Defendant was in the hospital, and asked her to come to the hospital. Ms. López arrived at the hospital between 1:30 AM and 2:00 AM in the early morning of February 7, 2017. Hearing, Apr. 28 at 10:04 AM. Ms. López found Defendant lying on a gurney and she mistook Defendant as dead. Ms. López shook Defendant for a few seconds to a minute until Defendant woke up. Upon waking, Defendant told Ms. López that he loved her and asked her to forgive him. Ms. López saw that Defendant's face was covered in blood and that he had a bloody bandage wrapped around his head, an open wound near his eye, blood was coming out of his mouth as he spoke, and his eyes were black and swollen. Hearing, Apr. 28 at 10:00 AM. Defendant was also covered by a sheet which Ms. López lifted to reveal that Defendant had bruises over his chest, stomach, and arms. Although Defendant was awake while Ms. López saw him and spoke to him, she expressed that at times, Defendant would "go out of it." Hearing, Apr. 28 at 10:05 AM, 10:19–10:20 AM. Ms. López was allowed to be with Defendant for about 15 minutes before a police officer took her out of the room. Ms. López stayed at the hospital until 5:00 AM that morning, but did she not see Defendant again at the hospital.

Between 6:30 and 7:00 AM on the morning of February 7, 2017, PRPD Officer Isander Rivera Ortíz ("Officer Rivera"), who back then was part of the PRPD's Sex Crimes Division, went to the hospital where Defendant was being treated after he was informed of Defendant's arrest. Hearing, Apr. 27 at 11:07 AM. Upon arriving, Officer Rivera was able to speak to the physician treating Defendant who told Officer Rivera that they had stitched Defendant's head injuries and given him acetaminophen. The physician also gave Officer Rivera permission to "interview" Defendant. Hearing, Apr. 27 at 11:08 AM. Officer Rivera then met and spoke with Defendant.[2] Officer Rivera noticed that Defendant had stitches on his head and that his hair had been shaved where the stitches were done.However, Officer Rivera stated that Defendant otherwise looked "fine" besides exhibiting

---

[2] During the evidentiary hearing, the parties stipulated that all of the Government's witnesses who testified were able to identify Defendant, Waldemar Martínez Ortiz, as the individual with whom they had interacted on February 7 and 8, 2017. Hearing, Apr. 27 at 9:15 AM.

some signs that his hand was hurting. Hearing, Apr. 27 at 11:09 AM. After Officer Rivera introduced himself to Defendant, he said that Defendant was going to be interviewed by PRPD Officer Giovanni Rojas and then taken to Officer Rivera's office to be interviewed. Defendant responded that "he had no problem with that." Hearing, Apr. 27 at 11:10 AM. After finishing this conversation with Defendant, Officer Rivera left Defendant alone and returned to the Bayamón Police Station.

Between 8:30 and 9:00 AM on the morning of February 7, 2017 PRPD Officer Giovanni Rojas de Jesús ("Officer Rojas") of the PRPD's Robbery Division went to the Doctors' Center Hospital, accompanied by a PRPD police lieutenant. They found another PRPD officer guarding Defendant and were able to have a conversation with Defendant's treating physician about Defendant's condition. The physician informed Officer Rojas that Defendant had suffered a "contusion" on his head but that Defendant's x-rays came out "fine." Hearing, Apr. 27 at 9:22–9:23 AM; 10:17 AM. The physician also told the officers that the only medication which had been administered to Defendant was acetaminophen, and that if Defendant complained of pain, Officer Rojas and the police "should only give him acetaminophen." Hearing, Apr. 27 at 9:24 AM; 10:29 AM. When Officer Rojas met Defendant, he saw Defendant lying on a gurney with stitches in his head and blood stains. Hearing, Apr. 27 at 9:24 AM. Officer Rojas began to ask Defendant what had happened to him, but the police lieutenant ordered officer Rojas to wait to question Defendant until he had been released from the hospital. Officer Rojas desisted from asking Defendant any questions and waited at the hospital for Defendant to be discharged.

### C. Defendant's First Interview in the Robbery Division (Officer Rojas)

Between 9:30 to 10:00 AM on February 7, 2017 Defendant was discharged from the Doctors' Center Hospital. Officer Rojas and the other PRPD officer who had been guarding Defendant then transported Defendant to the Robbery Division at the Bayamón Police Station. According to Officer Rojas, Defendant looked "physically fine" but "exhausted." Hearing, Apr. 27 at 9:27 AM. Upon arriving, Officer Rojas placed Defendant in an office and after asking Defendant if he wanted anything to eat or drink, he gave Defendant a honeybun and a water bottle. At 10:40 AM, Officer Rojas presented to Defendant a "*Miranda* Warnings Form" in Spanish, which Defendant read, and then Officer Rojas read Defendant his *Miranda* rights in Spanish. Hearing, Apr. 27 at 9:28–9:29 AM; ECF Nos. 78-1; 78-2. Defendant marked the box on the form indicating that he had read the rights, and he marked the box indicating that he understood the rights and that the waiver of his rights was "voluntary, without coercions, intimidation, violence, pressure, or any promise." ECF Nos. 78-1; 78-2. Both Defendant and officer Rojas supplied their signatures to the bottom of the form, which was dated February 7,

2017 at 10:40 AM. Hearing, Apr. 27 at 9:30 AM; ECF Nos. 78-1; 78-2.[3] After being advised of his rights and signing the *Miranda* Warnings Form, Officer Rojas asked Defendant why he had been arrested that morning and Defendant recounted how he had tried to rob the couple and had been beaten by his intended victims, among others. While Defendant was recounting the events leading to his arrest, Officer Rojas testified that Defendant was "lucid and completely fine." Hearing, Apr. 27 at 9:39 AM. During his conversation with Officer Rojas, Defendant also did not request any medication or make any claims to Officer Rojas.

### D. Defendant's Second Interview in the Robbery Division (Officer Mojica)

Once Officer Rojas took Defendant's statement regarding the circumstances leading to his arrest, Officer Rojas allowed fellow PRPD Officer Edilberto Mojica ("Officer Mojica") to interview Defendant regarding a car theft committed on February 1, 2017 that Officer Mojica was investigating. Officer Mojica's interview with Defendant began shortly before 11:30 AM on February 7, 2017. Officer Mojica saw that Defendant had some injuries so he asked Defendant if he was "okay" before proceeding to the interview. Hearing, Apr. 27 at 9:11–9:12 AM. Otherwise, Officer Mojica described Defendant as behaving in a "normal" way. Hearing, Apr. 27 at 9:25 AM. Officer Mojica advised Defendant of his rights and Defendant also completed a *Miranda* Warnings Form for the second time, which was signed both by Defendant and Officer Mojica and dated February 7, 2017 at 11:30 AM. Defendant also once again marked the boxes communicating that he had read the rights for himself, that he understood the rights, and that he voluntarily waived his rights. ECF Nos. 78-21; 78-22. Once Defendant agreed to talk, Officer Mojica asked about the incident on February 1, 2017. Defendant told Officer Mojica that on that day he had broken into a house, confronted a woman inside, and took from the residence a gaming console, a hard drive, cash, and a grey Hyundai Tucson vehicle. During the interview, Officer Mojica asked Defendant if he wanted to eat, but Defendant responded that he was not hungry and only wanted to drink water. Defendant made no other requests to Officer Mojica.

When Officer Mojica asked Defendant about the stolen property from the residence he had entered, Defendant volunteered to surrender the stolen property to Officer Mojica. Defendant also wrote a short statement by hand for Officer Mojica, briefly describing his robbery and theft of the property, and promising to return the stolen "belongings." ECF Nos. 78-23; 78-24. The written

---

[3] On all of the *Miranda* Warnings Forms introduced into evidence in this case, a space is also provided for a "witness signature." Defense counsel on cross examination asked Officers Rojas and Rivera about this matter and whether it was "standard procedure" or "normal" not to include a witness signature on the form. Hearing, Apr. 27 at 10:21, 11:51 AM. Officer Rojas responded testified that it was "not necessarily" standard procedure to have a witness for a *Miranda* waiver. Hearing, Apr. 27 at 10:21 AM. Officer Rivera conceded that it was not "normal" for the witness signature to be missing. Hearing, Apr. 27 at 11:51 AM. Nevertheless, Officer Rivera testified that although the form indicates that it should be signed for a witness it was "not necessarily" required to have a witness signature. Hearing, Apr. 27 at 11:51 AM.

statement denotes that it was completed at 11:45 AM on February 7, 2017. ECF Nos. 78-23; 78-24. Officer Mojica also testified Defendant provided him an address where he could find the stolen goods. Later, at an undefined time, Officer Mojica traveled to the address and met who he understood to be Defendant's consensual partner. Defendant's partner voluntarily returned a gaming console and the hard drive to Officer Mojica.

### E. Defendant's Third Interview in the Robbery Division (Officer Rojas)

After Defendant's interview with Officer Mojica, Defendant was again interviewed by Officer Rojas regarding a different robbery incident. At 12:35 PM, rather than relying on the original *Miranda* warnings he had given Defendant or Officer Mojica's warnings, Officer Rojas again provided Defendant with *Miranda* warnings and a *Miranda* Warnings Form because he was conducting what Officer Rojas considered to be a separate interview. Hearing, Apr. 27 at 9:50–9:51 AM; ECF Nos. 78-5; 78-6. The *Miranda* Warnings Form which Officer Rojas provided to Defendant bears the signatures of Defendant and Officer Rojas and is dated February 7, 2017 at 12:35 PM. ECF Nos. 78-5; 78-6. As with the first two forms, Defendant again marked the boxes indicating that he had read the rights for himself, that he understood the rights, and that he voluntarily waived his rights. ECF Nos. 78-5; 78-6. After completing the waiver form, Defendant told Officer Rojas about an incident where Defendant had entered the house of an elderly couple and stolen jewelry, money, and the couple's vehicle using a fake pistol. ECF Nos. 79-3; 78-4. While describing the robbery of the elderly couple, Officer Rojas reported that Defendant looked "fine[ and] [c]ompletely lucid also." Hearing, Apr. 27 at 9:50 AM. During the interview, Defendant only asked to drink water. With regard to this incident, Defendant also briefly completed a written statement which contained less detail than his verbal recitation. ECF Nos. 79-3; 78-4. The written statement records that it was completed at about 12:55 PM. ECF Nos. 78-3; 78-4. Once this interview was over, Officer Rojas walked Defendant down the hall to the Sex Crimes Division at the Bayamón Police Station roughly around 1:00 PM.

### F. Defendant's Fourth and Fifth Interviews in the Sex Crimes Division

Officer Rojas left Defendant with Officer Rivera of the Sex Crimes Division. With Officer Rivera was PRPD Officer Sheila Serrano Lugo ("Officer Serrano"), also of the Sex Crimes Division. Hearing, Apr. 27, at 11:13 AM.[4] When Defendant

---

[4] When asked if anyone else was with Officer Rivera when he was offering Defendant water and having the "initial conversation" with Defendant, Officer Rivera responded, "Yes, Officer Sheila Serrano." Hearing, Apr. 27 at 11:13 AM. When asked on cross-examination, he again affirmed that Officer Serrano was present. Hearing, Apr. 27 at 11:51 AM. Officer Serrano confirmed she was present at the beginning of Officer Rivera's interviews, testifying that "The interview was commenced by Officer Isander Rivera, he is the one who started the interview in relation to his cases." Hearing, Apr. 27 at 1:44 PM. Officer Serrano continued, explaining "[T]hen I took part in the interview asking him questions about my investigations." Hearing, Apr. 27 at 1:44 PM. Neither officer clarified whether the other officer stayed in the office for the entirety of the other officer's interviews, or only for portions.

arrived at the Sex Crimes Division, Officer Rivera asked Defendant how he was and offered him some water or soda. Defendant told Officer Rivera that his hand hurt, and he accepted a bottle of water from Officer Rivera. Officer Rivera then told Defendant that he was in possession of some criminal complaints regarding three rapes in Bayamón. At that point, Officer Rivera advised Defendant of his rights and Defendant completed, once again, a new *Miranda* Warnings Form where Defendant marked the boxes which denote that he read and understood his rights and voluntarily waived them. The form indicates that it was completed at about 12:45 PM and was signed by both Defendant and Officer Rivera.[5] ECF Nos. 78-9; 78-10.

Once Defendant had completed his waiver of rights, he began recounting how using a fake pistol, he had invaded the apartment of two sisters, forced them to perform oral sex on him, and then raped one of the sisters. Defendant provided a large number of details, such as that he left the condom he used during the rape on a table. While telling about this incident, Officer Rivera reported that Defendant was "calm" and did not make any complaints or requests besides conveying that his hand was in pain. Hearing, Apr. 27 at 11:34 AM. When Officer Rivera asked Defendant if he could write down what Defendant had recounted about the incident with the two sisters, Defendant agreed. However, after starting the written statement Defendant asked if there was any other way to write down the facts because he "had a lot to write" and his hand was hurting him. Hearing, Apr. 27 at 11:28 AM. Even so, Defendant hand-wrote a two-page statement describing the rape of the sisters which was signed by Defendant and Officer Rivera, listing a time of completion as 1:19 PM. ECF Nos. 79-11; 78-12.

Officer Rivera also conducted another interview with Defendant on the same day, February 7, 2017. Defendant began describing other rapes which he had committed, and because Defendant was talking about a different case, Officer Rivera decided to Mirandize Defendant again. Therefore, Defendant and Officer Rivera signed another *Miranda* Warnings Form. Defendant placed his initials next to the advisory statements and checked the boxes that indicate that Defendant read, understood, and voluntarily waived his rights. ECF Nos. 78-13; 78-14. This fifth *Miranda* Warnings Form was completed at 1:42 PM. ECF Nos. 78-13; 78-14. All told, Officer Rivera testified that he believes Defendant was tied to five sex-crime investigations to which Officer Rivera was assigned. Hearing, Apr. 27 at 11:42.

### G. Defendant's Sixth and Seventh Interviews in the Sex Crimes Division (Serrano)

Once Officer Rivera had finished interviewing Defendant with regard to his cases, Officer Serrano also interviewed Defendant in two pending sex crime

---

[5] The time indicating the advisal or rights on this *Miranda* Warnings Form as 12:45 PM is slightly inconsistent with the time indicated on Defendant's written statement with Officer Rojas, which lists that Defendant was not finished with Officer Rojas until 12:55 PM. The fact that the Robbery Division and the Sex Crimes Division are in the same building and in close proximity to each other makes this ten-minute discrepancy an insignificant concern for credibility purposes.

investigations in which Defendant was a suspect. Hearing, Apr. 27 at 1:44 PM. When beginning her interview, Officer Serrano noticed the stitches in Defendant's head and asked him if he had taken any medication for his head injuries. Defendant replied that the only medication he had taken was acetaminophen. Officer Serrano explained that she read to Defendant his *Miranda* rights and provided him with yet another *Miranda* Warnings Form—the sixth form during that day—which Defendant read out loud. However, while Defendant did mark the box on the form which states that he read the rights for himself, on this *Miranda* Warnings Form he did not mark the box indicating that understood the warnings and that that the waiver of his rights was "voluntary, without coercions, intimidation, violence, pressure, or any promise." ECF Nos. 78-15; 78-16. Officer Serrano also neglected to fill the blanks on the form which show the location, day, month, year, and time at which the waiver occurred. ECF Nos. 78-15; 78-16. Then Officer Serrano asked about an incident at a specific address in Bayamón and Defendant explained in great detail how he had entered a house and attacked a woman there. Officer Serrano was particularly impressed by the level of detail with which Defendant described the incident, and she remarked at the evidentiary hearing that Defendant provided details to her which even the victim had not given to the police. Hearing, Apr. 27 at 1:55 PM. In addition to being able to offer a large amount of detail, Officer Serrano also testified that Defendant was both "coherent" and acting "normal" during the interview and that he only mentioned that he had some pain in his hand. Hearing, Apr. 27 at 1:56–1:57 PM.

When the interview regarding the first case concluded, Officer Serrano asked if Defendant needed to take a break to use the restroom, drink some coffee, or smoke a cigarette, and Defendant requested a break to smoke. Hearing, Apr. 27 at 1:56 PM. After his smoke break, Defendant and Officer Serrano continued an interview regarding a second rape investigation. Officer Serrano again tried to advise Defendant of his *Miranda* rights and presented him an additional *Miranda* Warnings Form to sign. Defendant, however, told Officer Serrano that he did not want to sign another form because he had already signed one; but, he did not ask for an attorney or make any other request. Accordingly, Officer Serrano took the *Miranda* Warnings Form which Defendant said he would not sign and made a note in the bottom left corner reading "Does not want to sign. Since he signed [February 7, 2017]". ECF Nos. 78-17; 78-18. No precise time, or any other information was included on the form. ECF Nos. 78-17; 78-18.

Officer Serrano then asked Defendant what had occurred at the address related to the second case she was investigating. Defendant explained in detail how on the date in question he had entered an apartment with that address and found a man and a woman together. Defendant recounted how he had a pistol and that he tied up the man and the woman and then raped the woman. Officer Serrano recalled that Defendant's demeanor was the same as before while he explained this crime. Defendant also said that he felt "okay," and he communicated that he wanted to "finish the process" and asked that the officers "hurry" because he was hungry. Hearing, Apr. 27 at 2:12 PM.

Because of the quantity of information Defendant was sharing but because he complained of hand pain which prevented him from writing down the details, Officer Rivera decided to call a state prosecutor with whom Defendant agreed to speak. When Officer Rivera made the call, a prosecutor told him to bring Defendant down to the prosecutor's office. Hearing, Apr. 27 at 2:12 PM. Still, Officer Rivera wanted to wait to transport Defendant because there was press waiting outside the police station. Officer Serrano therefore took Defendant for another smoke break during which he was given a piece of cake and some soda and Officer Serrano promised to feed him a meal once they arrived at the prosecutor's office. Hearing, Apr. 27 at 2:11 PM. When the officers were ready to move Defendant, they took him out the back of the police station and to the prosecutor's office. The PRPD officers transported Defendant to the state prosecutor's office between 4:50 and 5:15 PM on the evening of February 7, 2017. Hearing, Apr. 27 at 2:12 PM. Officer Serrano bought food for the officers and for Defendant, and Defendant ate a hamburger and drank a soda at some undefined time after arriving at the prosecutor's office. Defendant also used the restroom at the prosecutor's office.

**H. Defendant's Sworn Statement**

At the state prosecutor's office Defendant met with state prosecutor Gretchen Pérez Catinchi ("Prosecutor Pérez"), who asked Defendant how he felt. Defendant told Prosecutor Pérez that he "felt fine but had some pain in his hand." Hearing, Apr. 27 at 11:40 AM. Prosecutor Pérez once again advised Defendant of his *Miranda* rights and provided Defendant with a printed form entitled "Advice [sic] of Rights, Warning You Should Give to a Suspect" which enumerated Defendant's *Miranda* rights. ECF Nos. 78-19; 78-20. This advisal of rights form included two blank spaces following the questions "Have you understood what I have explained?" and "Do you wish to make a statement?" ECF Nos. 78-19; 78-20. Officer Serrano witnessed Defendant write "Yes" next to both blank spaces and sign his name on the form. Hearing, Apr. 27 at 2:17 PM. Above Defendant's signature appears a section entitled "Voluntary Waiver" which declares "I have been read my rights that appear above, and they have been explained to me. I fully understand these rights and voluntarily waive them without being threatened or intimidated and without having received any promises of reward or immunity for making this statement." In spaces provided for the signature of witnesses, both Officer Serrano and Prosecutor Pérez also signed their names. ECF Nos. 78-19; 78-20. The form was then dated February 7, 2017 and indicated that the voluntary waiver was executed at 5:28 PM. ECF Nos. 78-19; 78-20.

After Defendant waived his rights, he began the recitation of his lengthy sworn statement. Prosecutor Pérez and Prosecutor Gini Andreu ("Prosecutor Andreu") were present during the statement along with a stenographer. Hearing, Apr. 27 at 2:19 PM. During the taking of the sworn statement, a prosecutor would ask Defendant about a particular incident. While Defendant was recounting the facts of the incident, the PRPD officer investigating the case would enter the room

and then leave when Defendant finished giving the facts. Accordingly, all four PRPD officers, Rojas, Mojica, Rivera, and Serrano, were present at different points of Defendant's declaration under oath, but not all four of them were allowed in the room with Defendant at the same time. Officer Rojas testified that during the portion of the sworn statement which he observed, Defendant appeared "lucid" and "totally fine." Hearing, Apr. 27 at 10:06 AM. Officer Rojas also described how Defendant never asked for an attorney, nor did he make any other claim, and that Defendant only said that he was "tired." Hearing, Apr. 27 at 10:07 AM. For the portions of Defendant's sworn declaration where Officer Rivera was present, he described Defendant as "calm." Hearing, Apr. 27 at 11:43 AM. Officer Serrano also testified that during the sworn statement Defendant was "very cooperative" "coherent at all times" and was "speaking normally." Hearing, Apr. 27 at 2:20–2:21 PM. During the taking of Defendant's declaration under oath, he was also given a break during which he asked to call his partner and her daughters on speakerphone. Officer Serrano supervised and listened to Defendant during that phone call, during which she heard Defendant tell his partner that if police came to her house, she should hand over to them "any belongings that she knew were not his." Hearing, Apr. 27 at 2:23 PM.

After Defendant made his phone call, the taking of the sworn statement continued and was completed shortly after 12:00 AM on what was then February 8, 2017. Officers Rojas, Rivera, and Serrano all witnessed Defendant's swearing and signing of the statement. When a draft of the sworn statement was completed by the stenographer, Officers Rojas, Rivera, and Serrano all mentioned that it was given to Defendant to read the entire statement. Officer Rojas testified that Defendant then "asked the stenographer to change about five or six words that were written incorrectly." Hearing, Apr. 27 at 10:02 AM. Officer Rivera explained that the prosecutor had remarked how Defendant "spoke very properly" and so Defendant "corrected the stenographer at times." Hearing, Apr. 27 at 11:46 AM. After Defendant was satisfied that all the corrections he wanted had been made, he raised his right hand and swore to the statement, initialed each page, and signed the last page. ECF Nos. 78-7 at 19; 78-8 at 1–19. Officer Rojas and Officer Serrano signed as witnesses to the last page of the sworn statement where also Prosecutor Pérez and the stenographer signed. ECF Nos. 78-7 at 19; 78-8 at 19. The last page of the sworn statement is dated February 8, 2017 at 12:30 AM. ECF Nos. 78-7 at 19; 78-8 at 19.[6]

### I. Defendant's Court Appearance & Transportation to Jail

Once the sworn statement was complete in the very early hours of February 8, 2017, Defendant was transported to the Bayamón Courthouse approximately 1:00 AM. After the court proceedings were concluded, Defendant

---

[6] The English translation of the sworn statement introduced into evidence, ECF No. 78-7, incorrectly lists a date of February 7, 2017. ECF Nos. 78-7 at 19. However, the Spanish original clearly contains a hand-written correction indicating the correct date of February 8, 2017. ECF No. 78-8 at 19. All of the witnesses who testified about the sworn statement also affirmed that the sworn statement was completed after midnight on February 8, 2017.

was taken to the 705 Regional Prison in Bayamón between roughly 3:00 and 4:00 AM of the morning of February 8, 2017.

**J. Defendant's Eighth Interview with the FBI**

On February 13, 2017, three agents of the Federal Bureau of Investigation ("FBI") took custody of Defendant for an interview, processing, and DNA collection. The FBI agents interviewed Defendant at roughly 12:00 PM, after feeding him lunch, in a room of the offices of the FBI in San Juan, Puerto Rico. The interview was audio and video recorded.[7] FBI Special Agents Jonathan Rich ("Agent Rich"), Verónica Cruz, and Ángel Martínez were present for the interview. Agent Rich testified at the suppression hearing that the agents asked Defendant how he was doing, and then Defendant was read *Miranda* warnings. According to Agent Rich, Defendant expressed that he understood his rights and signed a waiver form. Agent Rich explained that during the interview Defendant had scars and "staples or stitches" in his head, but that Defendant was "calm, collected" and talked normally. Hearing, Apr. 27 at 3:10 PM. The only request that Defendant made to the agents was to use the restroom, which he was allowed to do.

During his interview with the agents, Defendant confessed to three car jackings, as well as to a series of burglaries and robberies in Bayamón. Agent Rich described how Defendant specifically recounted the incident where he sexually assaulted two sisters, forcing one sister to perform oral sex on him and raping the other sister. Defendant also told the agents that in that instance he took the sisters' car and abandoned it a short distance away. According to Agent Rich, Defendant continued on and described several other occasions where he would enter a "female's" home with a knife or a gun to rob them and take their car. Hearing, Apr. 27 at 3:13 PM. With regard to all three carjackings, Defendant explained that after he took the vehicle, he would leave it close to where he had stolen it with the keys inside the vehicle. Agent Rich testified that the facts of the crimes to which Defendant confessed were consistent with FBI investigations into those crimes. Hearing, Apr. 27 at 3:13 PM. The interview concluded after about an hour-and-a-half.

**III. LEGAL ANALYSIS**

**A. Whether Defendant Was Advised of His Rights**

For statements which a criminal suspect made to police under custodial interrogation to be admissible at trial, police must have advised the accused of his right to counsel and his right to remain silent using *Miranda* warnings. *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 471 (1966)); *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In this case, all four agents of the PRPD, Officer Rojas, Officer Mojica, Officer Rivera, and Officer Serrano, provided Defendant with the same "*Miranda* Warnings Form" in Spanish. ECF Nos. 78-1; 78-2; 78-5; 78-6; 78-9; 78-10; 78-13; 78-14; 78-15; 78-16; 78-17;

---

[7] This recording was not introduced into evidence at the suppression hearing.

78-18; 78-21; 78-22. Each *Miranda* Warnings Form contained an adequate advisal of Defendant's right to remain silent and his right to counsel in accordance with *Miranda*. *See* 78-1; 78-2; 78-5; 78-6; 78-9; 78-10; 78-13; 78-14; 78-15; 78-16; 78-17; 78-18; 78-21; 78-22. With the exception of Officer Mojica, who only provided the waiver to Defendant once, the officers also gave Defendant the *Miranda* Warnings Form with its accompanying warnings at least twice, for a total of seven times on February 7, 2017. Additionally, both Officers Rojas and Serrano testified that they verbally advised or read Defendant his *Miranda* rights at least once in addition to providing Defendant the form to read for himself. Hearing, Apr. 27 at 9:28–9:29 AM; 1:44 PM. When Defendant arrived at the state prosecutor's office in the afternoon of February 7, 2017, he was again presented a form entitled "Advice [sic] of Rights, Warning You Should Give to a Suspect" which provided an adequate enumeration of Defendant's *Miranda* rights to remain silent and to counsel. ECF Nos. 78-19; 78-20. Likewise, on February 13, 2017, FBI special agents read Defendant his rights before he was interviewed. The evidence at the hearing therefore convincingly shows that Defendant was given proper *Miranda* warnings on February 7 and 13, 2017.

## B. Whether Defendant Indicated Waiver

When *Miranda* warnings are provided to a suspect, the suspect's statements are admissible provided that the government can show by a preponderance of the evidence that the defendant made a valid waiver of his rights. *Berghuis*, 560 U.S. at 382, 384. A defendant who makes the "simple, unambiguous statements" asserting that "he wanted to remain silent or that he did not want to talk with the police . . . would have invoked his "right to cut off questioning." *Id*. at 382 (internal quotations omitted). Therefore, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver . . . ." *Butler*, 441 U.S. at 373. The government, however, "does not need to show that a waiver of *Miranda* rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Berghuis*, 560 U.S. at 384. Implicit waiver occurs when after being informed and understanding his *Miranda* rights, the defendant continues to talk to police or answer their questions. *Id.* at 386 ("If Thompkins wanted to remain silent, he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation. . . . Thompkins' answer to Helgert's question . . . was sufficient to show a course of conduct indicating waiver."). A statement made as long as three hours after being supplied *Miranda* warnings does not undermine a defendant's implicit waiver, and the "[p]olice are not required to rewarn suspects from time to time." *Id.* If the government "establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate "a valid waiver" . . . The prosecution must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 384.

**1. Defendant's Indications of Express Waiver**

      Although the officers were not required to rewarn and secure multiple waivers from Defendant, the evidence in the record shows that several PRPD officers, prosecutors, and FBI agents secured express, written waivers from Defendant multiple times. During Defendant's first interview of the day of February 7, 2017, Defendant twice signed a *Miranda* Warnings Form with Officer Rojas. On both those forms appears a box alongside text which reads,

> I understand the rights that said warnings grant me and **I voluntarily waive** these with full knowledge that I can stop the questioning and/or invoke my right to be assisted by an attorney at any time. The waiver of these rights has been voluntary, without coercions, intimidation, violence, pressure, or any promise.

ECF Nos. 78-1; 78-2; 78-5; 78-6 (emphasis in original). Defendant marked an "x" in this box and signed on both forms, which functions as proof of Defendant's waiver of his rights. Butler, 441 U.S. at 373. Defendant again marked the same box and signed his name to the same *Miranda* Warnings Form once again with Officer Mojica and twice more with Officer Rivera—for a total of five times on February 7, 2017. ECF Nos. 78-9; 78-10; 78-13; 78-14; 78-21; 78-22.

      At the evidentiary hearing, Defendant made an issue on cross examination of the fact that on each *Miranda* Warnings Form supplies a space for a witness signature but that no witness signature was placed on any of the forms. However, law enforcement is not required to secure a waiver of *Miranda* rights in writing. *Id.* (authorizing "[a]n express written or oral statement of waiver . . . ."). If the waiver must not be written, then a written witness signature is also not required. While it might constitute poor police practice—or even an administrative violation—to question a suspect without another witness or to omit a witness signature, it is not a constitutional violation for police to omit a witness signature from a written *Miranda* waiver. The court also finds that the lack of a witness signature alone does not undermine the credibility of the officers' testimony and the various written waivers bearing Defendant's signature which attest to his indications of express waiver with PRPD Officers Rojas, Mojica, and Rivera.

      Subsequently, when at the state prosecutor's officer and before Defendant gave his sworn statement, he signed a form entitled "Advice [sic] of Rights, Warning You Should Give to a Suspect." ECF Nos. 78-19; 78-20. Under the heading, "Voluntary Waiver," the form reads "I have been read my rights that appear above, and they have been explained to me. I fully understand these rights and voluntarily waive them without being threatened or intimidated and without having received any promises of reward or immunity for making this statement." ECF Nos. 78-19; 78-20. The form also includes two blank spaces following the questions "Have you understood what I have explained?" and "Do you wish to make a statement?" ECF Nos. 78-19; 78-20. Officer Serrano testified that Defendant wrote "Yes" next to both blank spaces and signed his name at the bottom of the form. Hearing, Apr. 27 at 2:17 PM. The handwritten "yes" responses indeed appear on the form ECF Nos. 78-19; 78-20. Additionally, unlike the PRPD

*Miranda* Warnings Forms, the written waiver form which Defendant signed at the state prosecutor's office also bears the witness signatures of PRPD Officer Sheila Serrano and prosecutor Pérez. ECF Nos. 78-19; 78-20.

On February 13, 2017, in an interview with FBI agents which was recorded via video and audio, Defendant communicated to the agents that he understood his rights and then signed a written waiver form. Hearing, Apr. 27 at 3:09–3:10 PM.[8] All told, during Defendant's interviews with Officers Rojas, Mojica, and Rivera, and during the sworn statement and FBI interview, the testimony and written evidence in the record shows that Defendant expressly waived his rights in writing and, at times, verbally. Defendant's express waivers are valid as long as they were made knowingly, intelligently, and voluntarily, as further discussed below.

**2. Defendant's Indications of Implicit Waiver**

With regard to Defendant's interview with Officer Serrano, on the other hand, inconsistencies between the written evidence and Officer Serrano's testimony leads to the conclusion that Defendant did not expressly waive his rights in those interviews. Of particular importance is the first *Miranda* Warnings Form which Officer Serrano presented to Defendant, admitted into evidence as Exhibit 8A.[9] Officer Serrano testified that she read Defendant his rights and that Defendant also read his rights out loud from the form. Hearing, Apr. 27 at 1:46 PM. Exhibit 8A contains a box which was hand-marked with an "x" next to the printed and handwritten statement "I [Defendant] of 37 years old [sic] certify that today I was read and explained the above[-]mentioned warnings and that [I] Exercised . . . the right to read them for myself." ECF Nos. 78-15; 78-16. Furthermore, each advisal of rights statement bears Defendant's initials next to the statement. ECF Nos. 78-15; 78-16. Accordingly, Officer Serrano's testimony is consistent with Exhibit 8A, and supports a finding that Defendant was advised of his rights by Officer Serrano.

Officer Serrano also testified that when Defendant signed the *Miranda* Warnings Form, he verbally agreed to speak with her—thereby expressly waiving his rights. But Officer Serrano's testimony on this point is not consistent with the written evidence. In contrast to the other *Miranda* Warnings Forms provided by the other PRPD officers, Exhibit 8A not only lacks a mark from Defendant whereby he communicates that he voluntarily waives his rights, but the location, date, and time for this alleged verbal waiver was also not completed on the form. Officer Serrano stated at the hearing that she failed to complete the date and time on the form because Defendant quickly began recounting to her the facts of the incidents in question. Nevertheless, Officer Serrano admitted that she could have, but did not, return later and complete the information indicating the location, date, and

---

[8] In view that the recording was not introduced into evidence this finding rests on the court's credibility determination of Special Agent Rich's testimony.

[9] The original form was admitted as Exhibit 8B but is written in the Spanish language. ECF No. 78-16. Exhibit 8A is the certified translation of the original Spanish document. ECF No. 78-15.

time of the waiver. It is not credible that Defendant read his rights, initialed, and signed the form after having been advised of his rights, but did not check the box stating he voluntarily waived his rights when he did so verbally—particularly when he had already checked the box five previous times that day. Although Exhibit 8A confirms that Defendant was advised of his rights, it is so deficient with regard to Defendant's voluntary waiver that it undermines the credibility of Officer Serrano when she testifies that Defendant expressly waived his rights. As such, the court finds that Defendant did not expressly waive his rights during his first interview with Officer Serrano.

As for Officer Serrano's second interview with Defendant, Officer Serrano testified that she tried to present Defendant with another *Miranda* Waiver Form but that Defendant refused to sign it. In response, Officer Serrano took the *Miranda* Warnings Form which Defendant said he would not sign and made a note in the bottom left corner reading "Does not want to sign. Since he signed [February 7, 2017]". ECF Nos. 78-17; 78-18. Such a course of events is consistent with the written form admitted into evidence as Exhibit 9A,[10] which is completely blank besides the hand-written note described above. ECF Nos. 78-17; 78-18. While the form supports Officer Serrano's testimony that Defendant refused to supply his signature to the form, it does not support the assertion that Defendant expressly waived his rights verbally. Therefore, the court finds that in his second interview with Officer Serrano, Defendant was advised of his rights, refused to sign the form, but again began talking to Officer Serrano. Hence, Defendant did not expressly waive his rights in either interview with Officer Serrano.

Nevertheless, although Defendant's waivers were not express during either interview with Officer Serrano, his act of continuing to speak to Officer Serrano during both interviews indicated implicit waiver. *Berghuis*, 560 U.S. at 384 (finding that the defendant's answer to [law enforcement's] question was "sufficient to show a course of conduct indicating" implicit waiver.). Defendant had been advised multiple times of his rights, both by Officer Serrano and the other officers who had questioned him. Nevertheless, Defendant continued speaking to Officer Serrano—and for that matter, all other law enforcement officials on February 7, 8 and 13, 2017. Thus, Defendant's behavior was sufficient to show a course of conduct indicating implicit waiver of his rights as long as he understood his rights and was not coerced. *Id.* ("The prosecution must make the additional showing that the accused understood these rights."). In sum, the only remaining question is whether Defendant's express and implicit waivers on February 7 and 13, 2017 were executed knowingly, intelligently, and voluntarily so as to constitute a valid waiver.

---

[10] The original form was admitted as Exhibit 9B but is written in the Spanish language. ECF No. 78-18. Exhibit 9A is the certified translation of the original Spanish document. ECF No. 78-17.

**C. Whether Defendant's Waivers Were Valid**

Defendant moves to suppress the statements he made on February 7 and 8, 2017 on the premise that any of Defendant's waivers were not made voluntarily, knowingly, and intelligently. ECF No. 49 at 4. During oral argument, counsel for Defendant also argued that if Defendant did not voluntarily, knowingly, and intelligently waive his rights on February 7, 2017, the later statements Defendant made to FBI agents on February 13, 2017 must also be suppressed as "fruit of the poisonous tree." Hearing, Apr. 28 at 11:15 AM. The inquiry of whether a waiver is valid "is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Butler, 441 U.S. at* 373. The validity of a waiver is examined under "the totality of the circumstances." *United States v. Rojas Tapia*, 446 F.3d 1, 4 (1st Cir. 2006).

**1. Knowing & Intelligent Waiver**

First, Defendant argues that his waivers were invalid because he did not understand his rights due to the beating he suffered on the early morning of February 7, 2017. ECF No. 49 at 1, 3. Therefore, Defendant contends that he could not have provided a knowing and intelligent waiver. ECF No. 49 at 1, 3. "A waiver is made knowingly if a suspect has full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." *United States v. Carpentino*, 948 F.3d 10, 26 (1st Cir. 2020) (citing *United States v. Sweeney*, 887 F.3d 529, 535–36 (1st Cir. 2018)). For example, when police read the suspect his rights, confirm that the suspect understood the rights, the suspect signs a waiver form, and the suspect agrees to talk to police—especially more than once—that conduct provides strong evidence of "a complete understanding of those rights." *Id*. In this case, the evidence presented at the hearing strongly demonstrates that Defendant was aware of and understood his rights and the consequences of abandoning his rights, even despite his injuries.

First, while the evidence in the record clearly demonstrates that Defendant sustained injuries to his head in the early morning of February 7, 2017, his injuries were not severe enough to impair his ability to knowingly waive his rights. Defendant's witness Ms. López described how when she visited Defendant at the hospital between 1:30 AM and 2:00 AM on February 7, 2017, Defendant exhibited bloody wounds on his head and blackened eyes. She also testified that he appeared to "go out of it" at times. Hearing, Apr. 28 at 10:05 AM, 10:19–10:20 AM. Even so, by the time Officer Rivera visited defendant in the hospital approximately five hours later, he saw that Defendant had been cleaned up, his head was shaved, and he had received stitches for his head wounds. Officer Rivera described Defendant's demeanor in the hospital as "fine," although with some pain in his hand, and the physician treating Defendant told Officer Rivera that Defendant could be "interviewed." Hearing, Apr. 27 at 11:08 AM; 11:09 AM. By 8:30 to 9:00 AM, when Officer Rojas came to collect Defendant at the hospital, the physician informed him that while Defendant had suffered head injuries, his "x-

rays" came out "fine," he only needed acetaminophen, and Defendant was successfully discharged by the hospital between 9:30 and 10:00 AM. Hearing, Apr. 27 at 9:22–9:23 AM; 10:17 AM. By February 13, 2017 Defendant still exhibited the stitches on his head injuries, as shown in photos taken of Defendant on the following day. ECF Nos. 79-1; 79-2; 79-3; 79-4; 79-5. However, as with the interviews with the PRPD officers, no evidence was introduced that suggests that his injuries impaired his ability to understand the FBI agents who interviewed him on February 13, 2017. In sum, while Defendant was injured and healing from his injuries on February 7, 8, and 13, 2017 his wounds were adequately treated with stitches, his x-ray results did not indicate deeper or more severe head trauma, Defendant's condition could be sufficiently treated by simple acetaminophen, and the physician who treated him believed that Defendant's injuries did not prevent him from speaking to police. The above evidence indicates that while Defendant had suffered head injuries, they were not of the type or degree which would impair Defendant's ability to understand his rights or the consequences of abandoning them.

Second, Defendant was not under the influence of any strong medication or pain which would have impaired his ability to understand and knowingly waive his rights. Judging from the wounds which Defendant sustained it is easy to conclude that he was suffering from some pain at the very least on February 7 and 8, 2017. Defendant also repeatedly reported to the PRPD officers interviewing him that he was experiencing some pain in his hand. However, the physicians at the hospital told both Officers Rivera and Officer Rojas that the only medication which had been administered to Defendant on February 7, 2017 was acetaminophen. A physician likewise told Officer Rojas that if Defendant complained of pain, the only medication that Defendant should be given was more acetaminophen. Defendant himself told Officer Serrano on February 7, 2017 that he had only taken acetaminophen. That an over-the-counter pain killer such as acetaminophen was adequate to treat such pain indicates that it was not overwhelmingly severe to impact Defendant's mental state. Furthermore, no evidence was presented that indicates that acetaminophen was somehow strong enough to impair Defendant's ability to understand and knowingly waive his rights. The evidence regarding Defendant's interview with the FBI agents on February 13, 2017 also does not indicate that Defendant was administered any medication or was under severe pain which altered his mental state.

Third, Defendant's demeanor while speaking to law enforcement indicates that his mental state was unaffected and that he understood and knowingly waived his rights. From Defendant's first contact with police on February 7, 2017, the evidence in the record indicates that his mental state was not impaired. Even while being treated at the hospital, when Officer Rivera told Defendant that he was going to be interviewed by Officer Rojas before being interviewed by Officer Rivera, Defendant responded that "he had no problem with that." Hearing, Apr. 27 at 11:10 AM. When Officer Rojas began his interview with Defendant on February 7, 2017, he explained that Defendant looked "physically fine" and that

while Defendant recounted the events that led to his arrest he acted "lucid and completely fine". Hearing, Apr. 27 at 9:27 AM; 9:39 AM. During Defendant' subsequent interview with Officer Mojica, Officer Mojica testified that Defendant behaved in a "normal" way. Hearing, Apr. 27 at 9:25 AM. In Defendant's next interview with Officer Rojas, once again Officer Rojas reported that Defendant appeared "fine[ and] [c]ompletely lucid also." Hearing, Apr. 27 at 9:50 AM. At the Sex Crimes Division, Officer Rivera described Defendant as "calm" during his interviews with Defendant. Hearing, Apr. 27 at 11:34 AM. Likewise, during her two interviews with Defendant, Officer Rivera explained that Defendant was "coherent" and acted "normal," and that he told her that he felt "okay." Hearing, Apr. 27 at 1:56–1:57 PM; 2:12 PM. During Defendant's sworn statement at the state prosecutor's office, the officers who witnessed Defendant while he made the statement described Defendant as "lucid," "totally fine," "calm," "very cooperative," "coherent at all times," and "speaking normally." Hearing, Apr. 27 at 10:06 AM; 11:43 AM; 2:20–2:21 PM. Finally, on February 13, 2017 Agent Rich testified that during Defendant's interview with the FBI, Defendant was "calm, collected" and talked normally. Hearing, Apr. 27 at 3:10 PM. In sum, nothing about Defendant's behavior or demeanor during his interviews with law enforcement or during his sworn statements indicate that Defendant had trouble understanding, focusing, or communicating in such a way that would show his mental condition was harmed. Instead, Defendant's demeanor showed that he had no trouble understanding and could knowingly and intelligently waive his rights.

Fourth, the level of detail in Defendant's confessions indicate a high degree of mental functioning while he spoke with police. All the officers with whom Defendant spoke recounted how Defendant had provided detailed recitations of each crime to which he confessed. Defendant usually explained how he arrived and entered the residence in question, what weapon he used, what he did to the occupants inside, what he took from the residence, whether he stole a vehicle, and where he left the vehicle after leaving the premises. For example, according to Agent Mojica, Defendant recounted to him how on February 1, 2017 he had driven to a neighborhood with his partner's car, parked the vehicle, and walked to an apartment he intended to rob. Defendant explained he entered the apartment after climbing the stairs to the second story and saw that the keys were still in the lock on the inside of the screen door. Defendant said that he broke the screen and used the keys to open the door. Defendant explained that he found two women inside the apartment, announced the robbery, and ordered one of the women to cover herself with sheets on the bed of the bedroom. Defendant specifically explained that he then proceeded to take a PlayStation 4 gaming console, a hard drive, cash, a cell phone, and keys to a vehicle. While leaving, Defendant said that he left the cell phone in the kitchen and used the car keys to escape with the car parked at the apartment, abandoning it where he had previously parked his partner's vehicle. When Agent Mojica later went to collect the stolen goods related to this incident, Defendant's partner returned a PlayStation 4 gaming console and a hard drive to Officer Mojica. Hearing, Apr. 28, 9:24 AM. Officer

Serrano also specifically testified that in her 19 years of experience in law enforcement no suspect "had ever given to [her] a confession that was so precise, so straightforward, and so complete." Hearing, Apr. 27 at 2:36–2:37 PM. Officer Serrano even stated that with regard to one incident, Defendant had given her more details about the crime than even the victim herself. Hearing, Apr. 27 at 2:38 PM. Such detailed confessions strongly indicate that Defendant's mental state was unimpaired during his interviews on February 7, 2017. His memory was intact, he did not exhibit any confusion, and he willingly shared specifics of each criminal act.

Defense counsel objected at the hearing to any finding that Defendant had made detailed confessions because the PRPD officers interviewing Defendant had not taken lengthy or detailed notes. No notes from the police were introduced into evidence at the hearing. However, the officers asked Defendant to provide a hand-written confession recounting what he told them orally—but his written confessions were much shorter and much less detailed. Several officers testified that Defendant did not want to write very much because he complained of hand pain. Furthermore, such a result is consistent with the evidence because it is much easier and faster to explain an event in detail orally than attempt to write it down by hand. This is particularly true because Defendant's sworn statement before the state prosecutor, which was taken orally with the aid of stenographer, attests to and confirms the level of detail that Defendant shared verbally when recounting his criminal exploits. For example, Defendant's sworn statement regarding the incident on February 1, 2017 closely mirrors Officer Mojica's recitation of what Defendant told him about the event but contains additional details. In fact, Defendant's sworn statement contains more detail than what was shared by any of the witnesses at the hearing. When describing the incident wherein Defendant sexually assaulted two sisters before stealing their vehicle, Defendant's oral recitation recorded in the sworn statement spans approximately four pages of the transcript. ECF Nos. 7; 8, at 13–16. In those four pages, Defendant recounted the time and approximate location of the scene of the crime, specific conversations he had with each of the sisters, including how they offered to give him cocaine because they had no money. ECF Nos. 7; 8, at 13–14. Defendant also explained certain details of the house, including the number and location of rooms, the presence of a baby gate, furniture, and how he drank out of a gallon bottle of water from the refrigerator. ECF Nos. 7; 8, at 13–16. Defendant recounted in great detail how he forced both of the sisters to perform oral sex on him, what was said by him and both sisters during the sex acts, how he penetrated the vulva of one sister, and how he accidently left a used condom on "a small table where the television was." ECF Nos. 7; 8, at 14–15. Defendant even described during the sworn statement what clothes he was wearing during the crime, explaining that he wore "The black jacket with the smile, the motorcycle jacket, black jeans, and a yellow shirt with green on my face like a mask. I had grey tennis shoes." ECF Nos. 7; 8, at 16.

Additionally, Defendant also exhibited a mental clarity even at the latest stages of his interaction with law enforcement when he corrected portions of the sworn statement transcript. Officer Rivera expressed that the state prosecutor conducting the sworn statement remarked how Defendant "spoke very properly" and that he "corrected the stenographer at times." Hearing, Apr. 27 at 11:46 AM. Officer Rojas also explained how Defendant, upon reviewing the transcript of the sworn statement, "asked the stenographer to change about five or six words that were written incorrectly." Hearing, Apr. 27 at 10:02 AM. The fact that multiple witnesses testified that Defendant corrected the stenographer's transcript shows that Defendant did exercise a high degree of mental functioning even at the very end of the day on February 7, 2017 and into the early morning of February 8, 2017 despite his injuries, pain, or weariness. The transcript of the sworn statement and the PRPD officer's testimony also convincingly demonstrate that Defendant made extremely detailed confessions which evidence his ability to understand and knowingly waive his rights when he provided the confessions.

Finally, in light of the above evidence showing that Defendant's mental state was unaffected, Defendant repeatedly communicated that he understood his rights to law enforcement. The testimony by the PRPD officers and the written waivers in the record indicate that Defendant signed at least six *Miranda* waiver forms on February 7, 2017. On five of those forms Defendant also marked the box which communicates that he had read the rights for himself, that he understood the rights, and that he voluntarily waived his rights. Defendant also signed the advisal of rights form before his sworn statement at the state prosecutor's office, which included two "Yes" responses to the questions "Have you understood what I have explained?" and "Do you wish to make a statement?" ECF Nos. 78-19; 78-20. Finally, on February 13, 2017 Defendant once again expressed that he understood his rights and signed a waiver form with the FBI agents. This evidence alone provides strong evidence that Defendant possessed a "complete understanding" of his rights and is "strong proof of the validity" of his waiver with PRPD Officers Rojas, Mojica, and Rivera, during his sworn statement at the prosecutor's office, and in his interview with the FBI. *Carpentino*, 948 F.3d at 26; *Butler*, 441 U.S. at 373.

As already mentioned above, during neither of Defendant's interviews with Officer Serrano did Defendant complete the part of the *Miranda* Warnings Form which communicates that he understood his rights. However, Defendant had completed that portion of the form five separate times with Officers Rojas, Mojica, and Rivera before he arrived at the interview with Officer Serrano. It is reasonable to conclude that Defendant still understood his rights after expressing that he did five times previously that day. Defendant had also indicated that he understood his rights during his last interview with Officer Rivera shortly before beginning his interview with Officer Serrano. There is no reason to believe that in the interim Defendant suddenly became confused or ceased to understand his rights. Furthermore, during his last interview with Officer Serrano, Defendant refused to sign another *Miranda* Warnings Form because he had already signed

the same form previously. This act strongly indicates that after having reviewed his rights at least six times before on February 7, 2017 Defendant understood his rights to the degree that he did not need or want to go to the trouble of signing an additional form at that time. This behavior actually supports rather than undercuts a finding that Defendant understood his rights. In conclusion, all the above evidence convincingly shows by more than a preponderance of the evidence that at all times on February 7, 8, and 13, 2017 Defendant understood both the nature of his rights and the consequences of his decision to waive them.

**2. Voluntariness**

Defendant also argues that his waivers were invalid because they were not voluntary. *See* ECF No. 49 at 3. Defendant argues that during his interrogation by PRPD officers on February 7, 2017, he was "dizzy, in pain[,] . . . hungry, [and] also under medication given to him at the hospital . . . [Defendant] needed sleep and food. He was kept up all day, unable to sleep due to the environment he was in and the questions he was asked." ECF No. 49 at 3. "A waiver is made voluntarily if the waiver is 'the product of a free and deliberate choice rather than intimidation, coercion and deception.'" *Carpentino*, 948 F.3d at 26 (citing *Sweeney*, 887 F.3d at 536). The proper inquiry for assessing whether a confession is voluntary is "whether the will of the defendant had been overborne so that the statement was not his free and voluntary act." *Bryant v. Vose*, 785 F.2d 364, 367–68 (1st Cir. 1986) (citing *Procunier v. Atchley*, 300 U.S. 446, 453 (1971)). Coercion is evaluated under the totality of the circumstances considering "both the nature of the police activity and the defendant's situation." *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). "Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect." *Id*. "[D]eprivation of basic necessities, coupled with an unreasonably prolonged detention or interrogation, can affect the voluntariness of a waiver . . . Even so, a defendant asserting that a waiver was involuntary on this or any other basis must show some form of coercive law enforcement conduct or overreaching." *Carpentino*, 948 F.3d at 28. Specifically, under the totality of the circumstances, police must have either caused or took advantage of a Defendant's condition in such a way as to coerce the waiver of rights. *Id.* ("Given the totality of the circumstances, the defendant has not shown that the troopers either caused or took advantage of his hunger or exhaustion in a way that rendered his waiver involuntary.").

**a. Overt Coercion**

This case lacks any of the hallmarks of traditionally coercive police conduct. There is no evidence that on February 7, 2017 or February 13, 2017 Defendant was physically harmed by law enforcement during his questioning or custody. Nor did any law enforcement agent make any promises or threats to Defendant— either explicitly or subtly. *United States v. Hufstetler*, 782 F.3d 19, 24 (1st Cir. 2015)

("A promise or threat need not be explicit, but can also result from '[s]ubtle psychological coercion.'"). As already discussed at length above, at no point during his contacts with law enforcement on February 7, 8, or 13, 2017 was Defendant under the influence of any strong medications, and there is no evidence that Defendant's mental state was compromised or in a condition which would make him especially vulnerable to pressure or manipulation.

**b. Deprivation of Food & Water**

Defendant was also not deprived of the necessities of food and water. After arriving to the Bayamón Police Station on the morning of February 7, 2017, Officer Rojas provided Defendant with a water bottle and a honeybun. In Defendant's next interview with Officer Mojica, Officer Mojica also asked Defendant if he wanted to eat. Defendant replied that he was not hungry and only wanted to drink water. When starting his interview with Officer Rivera in the Sex Crimes Division, Officer Rivera offered Defendant water and soda and Defendant again accepted a bottle of water. It was only during his last interview at the police station did Defendant request that the officers "hurry" because he was hungry. Hearing, Apr. 27 at 2:12 PM. Therefore, after the questioning, while the police were waiting to transport him to the state prosecutor's office, Defendant was given a piece of cake and some soda. After police had successfully Defendant transported to the prosecutor's office, he was given dinner which consisted of a Burger King hamburger and a soda. Five days later on February 13, 2017, the FBI also provided Defendant lunch when he was interviewed. It is clear from the above evidence that rather than being deprived of food or water, PRPD officers and the FBI diligently provided him with drinks and food during all periods of his questioning.

**c. Pain**

Defendant's complaints of pain are credible but cannot be attributed to police misconduct calculated to induce confessions. The evidence shows that Defendant was hit repeatedly with a crowbar late in the evening of February 6 or early morning of February 7, 2017, which left serious gashes and bruises on his head and body. Officer Rivera of the Sex Crimes Division also visited Defendant at the hospital and reported that Defendant showed signs of hand pain. So, it is reasonable to conclude that Defendant would have experienced at least some pain throughout the day of February 7, 2017. Even so, the pain was not extreme or acute, judging by the fact that physicians at the hospital only gave Defendant acetaminophen and counseled police to do likewise. Additionally, his pain was not caused by police, his injuries occurred before his contact with the PRPD, and the officers took Defendant to be treated at the hospital.

Moreover, rather than withholding or conditioning medical treatment on Defendant waiving his rights, throughout the day on February 7, 2017, law enforcement officers noted Defendant's injuries and repeatedly asked Defendant about his wellbeing. First, PRPD officers, demonstrating a measure of self-restraint, did not interview Defendant about the crimes in question while he was

still receiving treatment at the hospital. Instead, they waited until they spoke with Defendant's physicians and after Defendant had been discharged. Later, during his interview in the Robbery Division, Officer Mojica noticed that Defendant exhibited signs of injury, and so he asked Defendant if he was "okay." Hearing, Apr. 27 at 9:11–9:12 AM. At that time, Defendant did not make any requests. Officer Serrano also inquired as to whether Defendant had taken any medication. Defendant told her that he had taken acetaminophen, but he did not request more.

In his interview with Defendant, Officer Rivera asked Defendant how he was, to which Defendant replied that his hand was hurting. For this reason, Defendant asked if there was another means to record his confessions instead of providing a hand-written statement. Because Defendant complained of hand pain to both Officers Rivera and Serrano, the PRPD officers and state prosecutors ultimately accommodated Defendant's complaints by allowing him to make a verbal statement with the service of a stenographer. Despite officers' repeated inquiries about Plaintiff's wellbeing, Defendant never asked for medical attention or for pain medication during his time at the police station or prosecutor's office on February 7 or 8, 2017. Similarly, Defendant did not complain of pain or ask for medication during his interview with FBI Agents on February 13, 2017, and the FBI agents did not condition medical treatment on his waiver of rights. Accordingly, while Defendant undoubtably experienced pain at least on February 7 and 8, 2017, his pain not severe, as evidenced by the absence of any requests for pain medication or medical treatment. It was also not the result of police violence, misconduct, or neglect, and police did not take advantage of Defendant's pain to induce him to waive his rights.

**d. Lack of Sleep**

Similarly, Defendant undoubtedly was tired when questioned by PRPD officers and giving his sworn statement. Defendant's lack of rest was partially due to his escapades during the late night of February 6, 2017 or very early morning of February 7, 2017, which resulted in his beating and subsequent hospitalization. Defendant's partner, Ms. López, testified at the evidentiary hearing that while at the hospital Defendant would sometimes seem to "go out of it." Hearing, Apr. 28 at 10:05 AM, 10:19–10:20 AM. But this testimony and the other evidence in the record does not make it clear whether Defendant actually slept at the hospital. At the very least, the evidence at the hearing indicates that Defendant did not sleep between the time he was discharged from the hospital around 9:30 to 10:00 AM on February 7, 2017 until after 3:00 or 4:00 AM on February 8, 2017. Therefore, Defendant was surely tired throughout the day, particularly as his interviews stretched late into the evening and early morning. Officer Rojas explained that when he began his interview, Defendant looked "exhausted." Hearing, Apr. 27 at 9:27 AM. Understandably, late on February 7 or early February 8, 2017 Defendant stated that he was "tired." Hearing, Apr. 27 at 10:07 AM.

However, police do "not coerce the defendant by failing, on their own initiative, to offer him an opportunity to sleep." *Carpentino*, 948 F.3d at 28. Furthermore, as will be further discussed below, the length of Defendant's interaction with police on February 7, 2017 bears no indication that it was a tactic designed to overbear Defendant's will through fatigue. Police did not threaten Defendant that he would not be able to sleep all day unless he gave confession after confession. Nor did they promise Defendant that he would be given a chance to rest if he admitted to the string of crimes in question. Instead, Defendant continued to speak freely to multiple police officers about a broad range of crimes (at least seven) which he said he had committed. At no point after having left the hospital between 9:30 and 10:00 AM, despite complaining of tiredness, did Defendant request a break to sleep, and law enforcement did not have to interrupt him to offer one while he continued to recount to them his criminal exploits. Therefore, although Defendant undoubtably suffered from physical tiredness during February 7, 2017, there is no indication that police took advantage of his fatigue in a way to render his waiver of rights involuntary.

### e. Breaks in Questioning

In addition to being given time to eat, Defendant was also afforded breaks to use the restroom, smoke, and communicate with his loved ones on the day of February 7, 2017. Defendant was offered two breaks to smoke, one between Defendant's interview with Officer Serrano and another before he was transported to the prosecutor's office. Defendant also used the restroom at the prosecutor's office. Additionally, Defendant was allowed visits and communication with his partner and loved ones. On the morning of February 7, 2017, Police did not prevent Defendant's consensual partner from visiting him in the hospital for at least fifteen minutes, despite the fact that he had been placed under arrest and was undergoing medical treatment. During the taking of the sworn statement at the state prosecutor's office, Defendant was also given a break where he was allowed to call and talk to his partner and her daughters on speakerphone. Officer Serrano supervised and listened to Defendant during that phone call, and she heard him tell his partner's daughters that he was fine, that he had eaten, and that they should not believe what they were seeing on television. Hearing, Apr. 27 at 2:23 PM. Officer Serrano also heard Defendant talk to his partner and he also communicated to her that he was fine, that he loved them, and that they should not worry "because he was going to be just fine." Hearing, Apr. 27 at 2:24 PM. Far from being held incommunicado for constant questioning, law enforcement gave Defendant breaks to smoke, use the restroom, and to communicate with loved ones.

### f. The Duration of Defendant's Custody and Interrogation On February 7, 2017

Finally, despite all of the above circumstances, it is undeniable that on February 7 and 8, 2017 the time Defendant spent in custody talking to law

enforcement was lengthy.[11] However, length of detention alone does not necessarily render a waiver of rights involuntary. *United States v. Carpentino*, 948 F.3d 10, 28–29 (1st Cir. 2020). "Courts generally find involuntariness based on the length of a suspect's detention or interrogation only when that factor is 'accompanied . . . by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats.'" *Id.* (citing *Berghuis*, 560 U.S. at 387). As already discussed in detail, despite the length of Defendant's interrogations in the aggregate while detained, law enforcement did not make threats or promises to Defendant or deprive him of food or water. Defendant was not under the effects of strong medication. While it is reasonable to infer that Defendant did not have an opportunity to sleep at the Bayamón Police Station or at the state prosecutor's office, he never requested an opportunity to rest or sleep, nor did he express that he was so exhausted that he could not or did not want to continue. Defendant was also afforded breaks and opportunities to communicate with loved ones.

Still, Defendant's total detention was lengthy because he was arrested by the PRPD in the very early hours of February 7, 2017 and was taken before a judge around 24 hours later at approximately 1:00 AM on February 8, 2017.[12] However, of that time, Defendant had spent most of the morning of February 7, 2017 in the hospital where he was treated for his injuries following his arrest. PRPD officers did not question Defendant until after he was discharged between 9:30 and 10:00 AM that morning. After that point, Defendant was subject to intermittent interviews for roughly fifteen hours—from approximately 10:00 AM on February 7, 2017 to 12:30 AM on February 8, 2017. Even so, to say that Defendant was subject to questioning for even fifteen hours would be misleading. Defendant

---

[11] In contrast to the events of February 7, 2017, Defendant was only taken into custody and interviewed by the FBI for around an hour-and-a-half on February 13, 2017. As such, the duration of Defendant's custody and interrogation was not a factor which indicates coercion on February 13, 2017. *See Carpentino*, 948 F.3d 28–29 (finding that an aggregate length of questioning for six hours was not enough "to raise an inference that the defendant's will was overborn.") Furthermore, Defendant has conceded that his only challenge to his statements made of February 13, 2017 is on the basis that it was "fruit of the poisonous tree" because of constitutional violations which he alleges occurred on February 7, 2017. Hearing, Apr. 28 at 11:15 AM.

[12] Defendant does not raise and, accordingly, the court does not analyze in its decision whether Defendant was subject to an unreasonable presentment delay before a judicial officer. *See Corley v. United States*, 556 U.S. 303, 316 (2009) ("*McNabb–Mallory* makes even voluntary confessions inadmissible if given after an unreasonable delay in presentment . . ."). Presentment delays are governed under 18 U.S.C.A. § 3501(c) and the Supreme Court cases and *McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957). "Section 3501(c) provides that a confession made by a person within six hours following his arrest or other detention 'shall not be inadmissible' solely because of delay in presenting the person to a federal magistrate." *United States v. Alvarez Sanchez*, 511 U.S. 350, 354–55 (1994). However, "[w]here a voluntary confession falls beyond the [six-hour] safe harbor, § 3501(c) then requires the court to determine whether the delay was nevertheless reasonable or necessary under *McNabb-Mallory*." *United States v. Jacques*, 744 F.3d 804, 813–14 (1st Cir. 2014). Even so, the Supreme Court has held "that § 3501(c) does not apply to statements made by a person who is being held solely on state charges." *Álvarez Sánchez*, 511 U.S. at 352. "[A] duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense." *Id.* at 357. Again, because it was not raised in either parties' legal memoranda or at oral argument, a full analysis of the presentment issue is not considered in the disposition of the instant motion to suppress.

participated in roughly seven individual interviews with four different PRPD police officers where each interview pertained to different criminal act. Each interview with the PRPD officers had an approximate duration of between fifteen minutes and an hour. For example, Defendant was Mirandized and signed the waiver form with Officer Rojas at 10:40 AM. By 11:30 AM, less than an hour later, Defendant was beginning a different interview with Officer Mojica. ECF Nos. 78-21; 78-22. Defendant waived his rights with Officer Mojica at 11:30 AM and then signed his hand-written statement after providing an oral confession only fifteen minutes later at 11:45 AM. ECF Nos. 78-21; 78-22; 78-23; 78-24. All together his interviews with the PRPD officers likely lasted for an aggregate time of about 6 hours on February 7, 2017.

Defendant later sat also down for a lengthier sworn statement at the state prosecutor's office which lasted approximately seven hours between Defendant's signing of the *Miranda* waiver at 5:28 PM and his swearing of the statement at 12:30 AM on February 8, 2017. ECF Nos. 78-19; 78-20; ECF Nos. 78-7 at 19; 78-8 at 19. Therefore, Defendant was not subject to constant interrogation and questioning for fifteen hours straight. That time was punctuated when Defendant was given breaks to eat, smoke, use the restroom, and communicate with his loved ones. He was not kept in the same location all day and was moved between offices at the Bayamón Police Station and eventually to the prosecutor's office. Such activities inherently reduce any coercive effect as compared to being held in a single place and "grilled" for hours on end by police and prosecutors on a single incident in an attempt to overbear the Defendant's will. Also, as will be discussed below, that length of time was due largely to the quantity of information Defendant was willing to provide in multiple confessions, not because the officers were pressing Defendant to obtain a single admission or waiver of rights.

In many cases involving lengthy interrogations, regardless of whether a waiver of rights was found voluntary or involuntary, law enforcement officers were investigating only one or two crimes and elicited a single confession at the end of lengthy questioning. *See e.g. Miranda,* 384 U.S. at 496–98 (1966) (one defendant confessed to two crimes after roughly 16 hours of questioning and another defendant confessed to one crime after five days in custody); *Corley v. United States*, 556 U.S. 303 (2009) (defendant began confession after 9 hours and 30 minutes of questioning and completed the confession 29 hours and 30 minutes after arrest); *Berghuis*, 560 U.S. at 376 (defendant silent for 2 hours 45 minutes before confessing to one crime); *Carpentino*, 948 F.3d at 28 (defendant waived his *Miranda* rights after 6 hours of detention); *United States v. Jacques*, 744 F.3d 804, 808 (1st Cir. 2014) (defendant confessed to one crime after approximately six hours of interrogation and a short break). In this way, the risk of lengthy questioning is that it becomes a tool to wear down the resistance of the suspect, leading him to relent to the prolonged questioning, waive his rights, and confess.

On February 7, 2017, Defendant was not subject to lengthy or aggressive questioning which slowly wore down and overbore Defendant's willingness to resist interrogation. Far from police inquiring for hours before Defendant made a

waiver, the evidence in this case demonstrates that Defendant promptly waived his *Miranda* rights and was willing to share statements with investigators relatively soon after his discharge from the hospital. Moreover, he waived his rights on multiple occasions. Unlike the cases cited above, Defendant was cooperative from the very first interview on February 7, 2017 and in all subsequent interviews held that day, freely recounting in great detail the crime in question. At times, as shown in the sworn statement, the prosecutor would interject to ask about a detail or clarifying question, and Defendant would immediately respond with the requested information. *See e.g.* ECF No.78-7.[13] The overall length of Defendant's custody was primarily due to the time it took Defendant to confess to such a large number of crimes. Defendant confessed in detail to at least seven separate criminal incidents during the day of February 7, 2017. Such a long litany of detailed confessions meant law enforcement needed time to record all the information that Defendant provided—as was accomplished with the taking of the sworn statement.

In short, this case is not one where police purposefully detained Defendant for a lengthy period in order to use the long duration of his detention and interrogation to overbear his will. Instead, Defendant was cooperative from the first interview that morning, in every subsequent interview, and during the taking of the sworn statement. As such, under the totality of the circumstances in this case, Defendant's length of detention, especially in the absence of other coercive behavior by police, does not render his waiver or his statements involuntary.

In sum, Defendant was not threatened, given any promises, or physically harmed by the police. Defendant was given food, water, bathroom breaks, smoke breaks, and an opportunity to speak with loved ones. Although Defendant was held for a long time for police questioning, it was not due to any police misconduct but rather, due to the long list of crimes which Defendant voluntarily confessed to investigators. Indeed, the circumstances indicate that Defendant was willing to talk to investigators rather than being coerced into doing so. Therefore, weighing all the evidence, Defendant's statements were voluntary, being clearly the product of a free and deliberate choice.

## IV. CONCLUSION

In conclusion, after Defendant was properly Mirandized on February 7, 2017, his explicit and implicit indications of waiver of his rights were exercised knowingly, intelligently, and voluntarily. Hence, Defendant's waiver of his rights was valid and not in violation of the Fifth Amendment to the United States

---

[13] "W: . . . I put both of them toward the second room.

P: Why didn't you take them to the first room?

W: Because there was a small gate there like for a child not to get out.

P: Continue.

W: I ask them to stay there, that what I want is money. One of them tells me they don't have money, that what she has is one dollar . . . [Testimony continues]." ECF No. 78-7.

Constitution. Because no constitutional violation of Defendant's rights occurred on February 7 or 8, 2017, there was no taint to any of Defendant's statements that he later made to the FBI on February 13, 2017 as "fruit of the poisonous tree." The evidence also indicates that Defendant was properly Mirandized and made a knowing, intelligent, and voluntary waiver of his rights on February 13, 2017 as well. Therefore, for the reasons set forth above, Defendant's motion to suppress should be DENIED.

The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); see also 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 27th day of May, 2022.

s/Marcos E. López
U.S. Magistrate Judge

Docket No. 84. After meticulous perscrutation of the foregoing legal analysis, the Court finds that the Magistrate's report and recommendation is not plainly erroneous.  The Court need proceed no further.

### III.    CONCLUSION

As Defendant did not object to the Magistrate's reasoning and because no plain error was committed, the report and recommendation is hereby **ADOPTED *in toto*** and accordingly, the Defendant's motion to suppress is hereby **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of June, 2022.

*S/Daniel R. Domínguez*
Daniel R. Domínguez
United States District Judge